J-A12008-20 & J-A12009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.-A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1861 WDA 2019 |

Appeal from the Order Entered November 21, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. CP-02-AP-059-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 1862 WDA 2019 |

Appeal from the Order Entered November 21, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. CP-02-AP-060-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 1863 WDA 2019 |

Appeal from the Order Entered November 21, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-061-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | No. 21 WDA 2020 |

Appeal from the Order Entered November 21, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-061-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | No. 22 WDA 2020 |

Appeal from the Order Entered November 21, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): No. CP-02-AP-060-2014

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JUNE 12, 2020**

In these consolidated appeals, the Allegheny County Office of Children,

Youth and Families ("CYF") appeals from the trial court orders entered on

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

November 21, 2019, denying its petitions to involuntarily terminate the parental rights of M.W. ("Mother") to her children, M.A.-D., a/k/a M.Y.D., a female born in February of 2006; A.Y.D., a female born in October of 2007; and A.M.D., Jr., a male born in July of 2010, (collectively, "the Children"). CYF also appeals the same orders denying its petitions to involuntarily terminate the parental rights of A.D. ("Father"), to A.Y.D. and A.M.D., Jr.[1, 2] The trial court denied the termination petitions based on the finding that granting Subsidized Permanent Legal Custodianship ("SPLC"), while maintaining the parental rights, would best serve the Children's needs and welfare.[3] After careful review, we affirm.

The factual and procedural history of this matter is as follows. Mother, Father, and their respective children have been known to CYF since 2002.

---

[1] The trial court granted CYF's petition to terminate Father's parental rights to M.-A.D., to whom he is the presumptive Father. The trial court also granted CYF's petition to terminate the rights of C.W., a putative father to M.-A.D., pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (b), and the rights of the Unknown Father, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8) and (b). The grant of the petition with regard to Father's parental rights to M.-A.D. is not at issue in this appeal, nor is the grant of the petition as to C.W. or any unknown father.

[2] In two separate orders, entered on January 7, 2020, and January 22, 2020, this Court, acting *sua sponte*, consolidated the three appeals regarding Mother and the two appeals regarding Father, respectively. On February 5, 2020, this Court listed consecutively for disposition the consolidated appeals regarding Mother and the consolidated appeals regarding Father. For ease of disposition, we have addressed all of CYF's appeals in a single memorandum, as did the trial court.

[3] SPLC is defined *infra*.

Mother and Father began a relationship in 2005. N.T., 2/6/19, at 199. Notably, the Children were removed from the care of Mother in January of 2013 because Mother attended a family group decision-making conference in an intoxicated condition with A.M.D., Jr. *Id.* at 202. Subsequently, CYF went to Mother's home, and found Mother unconscious and bleeding, with A.M.D., Jr., left unattended. *Id.* Father arrived but refused to allow CYF to perform a home assessment, so the Children were not placed in his care at that time.[4] *Id.* On June 10, 2014, A.M.D., Jr., and A.Y.D. were placed with Father, and CYF closed its case with regard to those two children. *Id.* M.-A.D. has not returned to the care of either parent since her removal in January 2013. *Id.* M.-A.D. was most recently adjudicated dependent on February 25, 2013. At some point before August of 2015, Father returned A.M.D., Jr., and A.Y.D. to Mother. *Id.* at 203. CYF received a report that Mother presented at a domestic violence shelter and was intoxicated while caring for A.M.D., Jr., and A.Y.D. *Id.* On September 14, 2015, A.M.D., Jr., and A.Y.D. were adjudicated dependent.

The Children have mental health and behavioral problems that have made their placements in foster care difficult. As a result, M.-A.D. has had twenty-two placements, and has been psychiatrically hospitalized five times. *Id.* at 204. A.Y.D. has had ten placements, and A.M.D., Jr., has had eight placements. *Id.* CYF previously filed petitions for the involuntary termination of parental rights of Mother and Father to the Children in 2014, but withdrew those petitions due to Father's progress. *Id.*

---

[4] Mother and Father had ended their relationship.

On September 27, 2017, CYF again filed petitions to involuntarily terminate Mother and Father's parental rights. The court appointed Anastasa Williams, Esquire, to serve as both a guardian *ad litem* and legal interests counsel for the Children.[5]

The trial court held evidentiary hearings on the petitions on October 15, 2018, February 6, 2019, and November 6, 2019. At the October 15, 2018 hearing, CYF presented the testimony of Allison Kroll, the CYF casework supervisor. Mother and Father appeared with separate counsel, and each testified on their own behalf. At the February 6, 2019 hearing, CYF presented the testimony of Brittany Tomasic, A.Y.D.'s therapist from Auberle; Tarraca

---

[5] M.-A.D. and A.Y.D., at ages thirteen and twelve respectively, have expressed preferences against adoption. **See** 23 Pa.C.S. § 2711(a)(1) (providing that the consent of an adoptee, if over the age of 12, is required for adoption). The trial court perceived no conflict between the best interests of the Children and their legal interests, and appointed only one counsel to serve as both a legal interest counsel and GAL for the Children. **See In re Adoption of L.B.M.**, 639 Pa. 428, 161 A.3d 172 (2017) (plurality). **See also In re T.S.**, 648 Pa. 236, 192 A.3d 1080 (2018) (filed August 22, 2018) (holding that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). **See also In re: Adoption of K.M.G.**, 219 A.3d 662, 669 (Pa. Super. 2019) (*en banc*) (filed September 13, 2019) (holding that this Court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation) (*limited appeal granted*, December 9, 2019).

At the final termination hearing, the Children's legal interests counsel/GAL stated that the termination of Mother's parental rights is not in the best interests of the Children. N.T., 11/6/19, at 205-208. The Children's legal interests counsel/GAL added that termination of Father's parental rights is not in the best interests of A.Y.D. and A.M.D., Jr., but noted that termination of Father's parental rights to M.-A.D. would not have a negative effect on M.-A.D. **Id.** at 206.

Jackson, a supervisor from the Allegheny County Health Department drug and alcohol screening laboratory; Bonnie Petrosky, a CYF caseworker in the permanency department for A.M.D., Jr.; Neil Rosenblum, Ph.D., the court-appointed psychologist; Leanne Redulic, a CYF matching specialist for M.-A.D.; Gail Redman, a foster care caseworker for A.M.D., Jr.; and Amy Rendos, supervisor of visit coaching at Project Star. On November 6, 2019, CYF again presented the testimony of Allison Kroll and Toni Baird, the clinical supervisor for a program at Holy Family Institute. Dr. Rosenblum testified a second time. Father and Mother appeared, and each testified again on their own behalf.

Based upon the testimony and documentary evidence provided at the hearings, the court set forth the factual and procedural background of these appeals, as follows.

> The parents' problems are reflected in the goals set for them. Mother's goals were to improve her parenting skills, obtain stable housing, attend mental health treatment, maintain sobriety from her substance abuse problem primarily with alcohol but also with marijuana and to engage in visits. [Notes of Testimony, February 6, 2019, ("Tr. I")] at 205. Father's goals were similar; he was to address his substance abuse problems — [sic] primarily involving alcohol but also marijuana — to engage in domestic violence counseling, to obtain stable housing and to attend parenting classes. Id. at 222. Originally, his goals also included marriage counseling, but he and Mother separated permanently. Id. [See also Notes of Testimony, November 6, 2019, ("Tr. II")] at 140 (wherein Mother testified that she has no contact with Father, although Mother is aware that the [C]hildren love him). Numerous services were offered to Mother and Father over the years with mixed results. See Tr. I at 207-19, 224-40. Overall, Father made more progress and participated more reliably in services than Mother[,] although it cannot be said he completed his goals, and he sometimes declined services outright when he believed they were not warranted. Id. at 224-40. The court-appointed psychologist[, Dr. Rosenblum,] was unable to testify to professional certainty that he could recommend termination of

parental rights in this case. See Tr. I at 99-104. See also Tr. II at 96.

. . . .

## M.Y.D.

M.Y.D. is the biological daughter of Mother only. M.Y.D. is 13. See Tr. I at 252. M.Y.D. has problems with verbal and physical aggression and difficulty with impulse control. See id. at 71. She has been diagnosed with Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder. Id. As of the [second] hearing, she had been in the heavily structured setting of Passavant Memorial Care Home for about three years. See Tr. II at 102. Although Dr. Rosenblum found that she had improved in that placement somewhat, he noted that her progress by February of 2019 was moderate, that she continued to need intensive mental health treatment and that she would pose a major challenge in a foster-family setting. See Tr. I at 72. In fact, the psychologist[, Dr. Rosenblum,] went so far as to say that the child would be at great risk for a failed adoption, explaining that, despite CYF's petition for it, "terminating parental rights is literally reckless." Id. at 99. Given that her [m]other has been the only consistent figure in M.Y.D.'s life who has shown her love, with termination of parental rights, the psychologist[, Dr. Rosenblum,] testified that "[all] you're doing is making her a psychological orphan." Id. at 100. Mother, though not always present, provides this fragile child with emotional support, and M.Y.D. enjoys Mother's company. Id. at 95. Dr. Rosenblum characterized their relationship as necessary and beneficial to M.Y.D. Id.

CYF presented the testimony of a matching specialist[, Ms. Rendulic,] whose job it was to find [a] placement for M.Y.D. She informed the [c]ourt about the failed efforts to find a relative to take in M.Y.D. and that she had finally given up on actively looking for family members for this girl. Id. at 138. The matching specialist did agree that M.Y.D. improved somewhat at Passavant. Id. at 137. The matching specialist had worked with M.Y.D. since January of 2016, and, although the specialist worked "continuously" to find a foster home for this child, she had not succeeded by February of 2019[,] and was unable to agree with the CYF caseworker[, Ms. Kroll,] that terminating parental rights would make placement easier. Id. at 136-38, 141-43, 251-52.

By the second part of the hearing in November of 2019, M.Y.D. had finally been placed in a foster home, but had only been there for two months. See Tr. II at 10-11. M.Y.D. was continuing to visit with Mother three times per month. Id. at 12-13. M.Y.D. had stated that she liked the foster home, but she had tried to run from it on one occasion in those first two months, although she did come back quickly after the police were contacted. Id. at 11-12, 27, 50. Dr. Rosenblum testified that he had not performed an updated evaluation since the first hearing date but reiterated his reservations about moving M.Y.D. to a goal of adoption without evidence that she could remain in that home successfully, characterizing such action as "premature." Id. at 88-89, 102. Although he indicated he would need an evaluation to give an opinion about the placement, he emphasized that M.Y.D. had a significant history of mental health and adjustment issues, and that she would certainly need more time for the situation to be assessed, even for permanent legal custodianship ["PLC"]. Id. at 91, 94-95.

## **A.Y.D.**

A.Y.D. is the biological child of Mother and Father and is 12 years of age. The psychologist[, Dr. Rosenblum,] saw this child four times and testified that A.Y.D. also has difficulty with impulse control, can be mouthy and irritable[,] and has trouble controlling her emotions. See Tr. I at 75. He opined that she required continued mental health treatment. Id. A.Y.D. resides with a foster mother now, but it took a long time to find one, with the child undergoing 10 different placements beforehand. Id. at 78, 204.

A.Y.D.'s therapist[, Ms. Tomasic] testified that A.Y.D. talks about Mother and Father and how much she misses and loves them. Id. at 9-10, 12, 17, 24-25. According to the therapist, A.Y.D. looks forward to parental visits, and describes Father as funny and fun[,] and tells the therapist about the places he takes her. Id. at 12, 24-25. The therapist [, Ms. Tomasic,] noted that Father has been consistently involved in this child's life. Id. at 25. The psychologist[, Dr. Rosenblum,] stated that he believed that, ultimately, [PLC] would serve A.Y.D. better than adoption because of the meaningful relationships she has with her parents, especially with Father. Id. at 100-02, 123.

## A.M.D., Jr.

The third child in this case is A.M.D., Jr., age 9. A.M.D., Jr., according to the psychologist[, Dr. Rosenblum,] has a high degree of impulsivity like his siblings. Id. at 73. He also suffers from ADHD [Attention Deficit Hyperactive Disorder, "ADHD"] and can be aggressive and oppositional. Id. at 74. After eight placements, he was seemingly settled in with his current foster mother, who is patient with him, even though has done things like put a hole in her wall in a fit of anger. Id. This [c]ourt did hear testimony from the coordinator for foster care[, Ms. Redman], who believes that A.M.D., Jr., has improved in the home[,] although the CYF case supervisor[, Ms. Kroll], at the following hearing, agreed that he still exhibited behavioral problems there. Id. at 150; Tr. II at 15.

Dr. Rosenblum's conclusions were the same as they were with A.Y.D. — that [PLC] was preferable to adoption. See Tr. I at 100-01, 103-04, 123. Dr. Rosenblum gave a detailed description of the boy's interactional visit with Mother[,] where the boy went to her and hugged her for almost 10 minutes straight, demonstrating that the relationship is very meaningful to him. Id. at 113. Dr. Rosenblum said that sometimes A.M.D., Jr., is reluctant about visits, but[,] when he knows that Mother is coming, he is willing to go[,] and that, at the interactional, the boy was "overwhelmed with emotion" upon seeing Mother. Id. at 114. The psychologist[, Dr. Rosenblum,] believed termination would hurt the boy, and that his foster mother had even been afraid to raise the issue for fear of destabilizing him. Id. at 114-15. A.M.D., Jr., also remains very attached to[,] and expresses great love and affection for[,] Father. Id. at 115, 123-124, 129.

Finally, as to the three [C]hildren, it is clear to the [c]ourt that they are very bonded to each other despite their separate residences. See Tr. I at 77.

## Mother

Mother has struggled throughout this case, and it cannot fairly be said that she has met her goals[,] because she has progressed and relapsed in cycles. See, e.g., id. at 87, 89. However, she has always made her way back to the [C]hildren and maintained a positive and loving relationship with them[,] when available. Mother's substance abuse problem bedevils her, and she has failed

to show up for numerous drug screens when requested, as attested to by a witness from the Allegheny County's [sic] Health Department. Id. at 32-33. It should be noted that Mother did state at the second hearing that she was tested at the three-quarter home[,] where she resided prior to finding her recent housing[,] although she also admitted to one recent positive test for THC [tetrahydrocannabinol], indicating marijuana usage. See Tr. II at 110-11, 137, 141. The psychologist[, Dr. Rosenblum,] testified that Mother does acknowledge her substance abuse problems, and that she has a history of domestic violence with a boyfriend other than Father. See Tr. I at 87. Mother also acknowledged her mental health history to CYF. Id. at 206. Mother has had treatment for ADHD, and Bipolar disorder and, in the psychologist's[, Dr. Rosenblum's] view, has trouble understanding the [C]hildren's emotional needs because Mother's own issues interfere in her parenting. Id. at 88-89. She suffers from depression and guilt about the [C]hildren, but loves them, even if she does not always keep them in the forefront of her mind. Id. at 89. The psychologist[, Dr. Rosenblum,] credibly opined that Mother needs continued mental health care[,] and is not now able to meet the [C]hildren's essential needs. Id. at 89-90.

Dr. Rosenblum saw A.M.D., Jr., during interactional sessions with Mother[,] and observed that Mother had difficulty providing the structure the boy needs[,] although she showed improvement over time. Id. at 92-93. Mother also improved slowly in her responsiveness to the [C]hildren and in engaging them in constructive activities. Id. at 88. Mother's relationship with M.Y.D. is the best of the three [Children], and Mother clearly makes M.Y.D. feel loved, as described above. Id. at 95. At the time of the first hearing, Mother was following through with more visits [with] M.Y.D. Id. at 108. At the second hearing toward the end of the year, Mother was participating in mental health treatment[,] and was visiting with the [C]hildren three times per month with supervision. See Tr. II [at] 18-19, 34-35. At that time, Mother herself testified that she had moved out of supportive housing and into a one-bedroom apartment, although she did not want CYF to evaluate it before she got more furniture. Id. at 17-18, 112, 116-17. In summary, Mother was participating more in services and working on her goals at the time of both hearings, but the [c]ourt recognizes her history of upswings and

downswings[,] and agrees that Mother cannot independently care for the [C]hildren. Id. at 219, 221.

### Father

Father overall has done a better job of making progress as a parent, but without sufficient stability to become their caretaker. Nonetheless, this [c]ourt finds that A.M.D., Jr., and A.Y.D. are beneficially bonded to him in a mutually loving relationship, and the two children need him. Id. Father was holding down two jobs in the year prior to the second hearing. Id. at 154-55. He can be willful and sometimes fails to participate in programming or drug and alcohol screens because of his frustration with the system and its scrutiny of him[,] although he also did experience relapses. See, e.g., Tr. I at 32-33, 82-83, 184. See also Tr. II at 23-25, 59, 79, 167-68, 185-86. Father was facing criminal charges at the time of the first hearing, and his preoccupation with the possible outcomes affected his visitation for a time, but[,] by the second hearing, he was on probation with no further concern for incarceration, having pleaded guilty to possession of firearms and making terroristic threats. See Tr. II at 21, 170.

Dr. Rosenblum testified that Father has shown increased parenting skills and increased engagement with the [C]hildren during visits. See Tr. I at 85. Father's primary problems in the past in interacting with the [C]hildren involved a lack of animation and some detachment, for example spending time texting rather than talking to the [C]hildren. Id. at 90, 183-184. Dr. Rosenblum concluded that Father does want to do better with them[,] and lets the [C]hildren know he is proud of them and loves them. Id. at 91-92. Significantly, the psychologist [, Dr. Rosenblum,] testified as follows: His kids really love him and I think that he's done a good job of making them feel welcome, making them feel that he cares about them, maintaining a sense of family and connectedness to one another. ... [H]e has a way of infusing his children with a sense that "I love you, we're connected, and we're a family." They have not let go of that. Id. at 123-24.

Trial Court Opinion, 1/24/20, at 2-8.

On November 21, 2019, the trial court entered orders as to each of the

Children granting in part and denying in part CYF's petitions, as explained

*supra*. The trial court denied CYF's petitions and concluded that CYF did not meet its burden of proof pursuant to 23 Pa.C.S.A. § 2511(a) or (b) for the involuntary termination of parental rights of Mother to all three Children and of Father to A.M.D., Jr., and A.Y.D.[6]

Thereafter, CYF timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, CYF raises two issues for our review:

1. Did the Orphans' Court err as a matter of law and/or abuse its discretion in denying CYF's petition to involuntarily terminate [Mother's/Father's parental rights] pursuant to 23 Pa.C.S.A. § 2511(a)(2), and (8) after CYF proved by clear and convincing evidence the statutory grounds for termination?

2. Did the Orphans' Court err as a matter of law and/or abuse its discretion in denying CYF's petition to involuntarily terminate [Mother's/Father's parental rights] pursuant to 23 Pa.C.S.A. § 2511(b) after CYF proved by clear and convincing evidence that termination of Mother's[/Father's] parental rights would best serve the developmental, physical and emotional needs and welfare of the [C]hildren?

CYF's Briefs at 5.

CYF contends that the court abused its discretion when it denied CYF's petitions. CYF argues that it proved by clear and convincing evidence that Mother and Father failed to remedy their incapacity to parent related to the issues which caused the Children to be removed from the parents' care.

In reviewing an appeal from the denial of a petition to terminate parental rights, we adhere to the following standard:

---

[6] As noted *supra* in n. 1, the court granted CYF's petition as to the termination of Father's parental rights to M.-A.D.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel–Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re I.E.P.*, 87 A.3d 340, 343–44 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (*quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). "Satisfaction of the requirements in only **one** subsection of Section 2511(a), along with consideration of the provisions in Section 2511(b), is sufficient for termination." *In re Z.S.W.*, 946 A.2d 726, 729 (Pa. Super. 2008) (brackets omitted, emphasis in original).

Section 2511 of the Adoption Act provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

23 Pa.C.S. § 2511(a)(2).

With respect to section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental

care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

In the present case, the trial court conceded that it could find grounds to terminate the parental rights of Mother and Father:

> Given the parents' inconsistency in making progress toward their goals and the amount of time each has had to make significant changes, this [c]ourt could find grounds to terminate the parents' rights, particularly under Subsection (a)(2). The [c]ourt notes, however, that at different points in the case during a parental upswing, this would not have been the correct result in striking a balance between the parents' progress and the [C]hildren's needs. It is a frustration to all involved that neither parent has managed to do better over a consistent period of time, knowing the bond that the [C]hildren have with them. In this difficult case, it is noteworthy that even the expert psychologist [, Dr. Rosenblum,] could not offer a view on the preferred outcome with reasonable professional certainty.

Trial Court Opinion, 1/24/20, at 10.

While the trial court noted that it could find that CYF met its burden under section 2511(a)(2),[7] the court concluded that neither reunification nor

---

[7] As the trial court focused on section 2511(a)(2), and conceded that CYF met its burden thereunder, we need not discuss a second subsection of section (a), i.e., (a)(8). *In re Z.S.W.*, 946 A.2d 726, 729 (Pa. Super. 2008).

adoption is best suited for the Children's needs and welfare, and concluded

that SPLC[8] is appropriate in this case.  The court explained:

> Although both parents have relapsed in their sobriety and have gone through times in which their participation waned, both have consistently tried again and again, and both have demonstrated love and commitment to the [C]hildren.  None of the [C]hildren want to sever their ties, and all express deep affection for their parents[,] and have beneficial and bonded relationships with them.  Witnesses testified that, after the passage of so much time, achieving permanence with another family becomes more difficult.  While adoption is often a preferred result, as the court-appointed psychologist Dr. Neil Rosenblum explained in straightforward terms, "in this particular case we're not dealing with young children who are going to say, you know, they have a new mommy and a new daddy."  Id. at 101.  See also id. at 115; Tr. II at 219-23.

---

[8] In **In re Adoption of J.N.M.**, 177 A.3d 937, 946 n.9 (Pa. Super. 2018), this Court stated that SPLC is one of the permanency goals the juvenile court may consider at each permanency review hearing.  42 Pa.C.S. § 6351(f.1)(3). SPLC is a program that was created in 2001, in which financial support is provided to families willing to become permanent legal custodians under 42 Pa.C.S. § 6351(f.1)(3), whereby permanent legal custody is transferred to the dependent child's legal custodian without requiring the termination of the parents' parental rights, and, where deemed appropriate, the trial court may permit the continued visitation by the dependent child's parents.  **J.N.M.**, 177 A.3d at 946 n.9 (quoting **In re B.S.**, 861 A.2d 974, 977 (Pa. Super. 2004)). The legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

The panel in **J.N.M.** stated that alternative permanency arrangements such as an SPLC offer less stability than adoption because parents may petition the court to attempt to re-gain custody at any time, but an SPLC may be appropriate in cases where reunification or adoption is not in the best interest of the child.  **J.N.M.**, 177 A.3d at 946 n.9 (citing **In re S.H.**, 71 A.3d 973, 978 (Pa. Super. 2013)).

Primarily for these reasons, the [c]ourt could not in good conscience grant CYF's petitions to terminate parental rights. On the other hand, the evidence showed that neither parent is in a position to care for these [C]hildren, and years of services and reunification efforts have not changed this. Further, the [C]hildren's foster placements, imperfect or not, are reasonable for them at this time, given their individual needs and difficulties in foster care.

Trial Court Opinion, 1/24/20, at 11.

The trial court concluded that SPLC is most suited for cases precisely like this one, and credited the testimony of Dr. Rosenblum, who proffered that "SPLC could satisfy a permanency outcome for these children in a satisfactory manner". N.T., 2/6/19, at 101. The legal interests counsel/GAL suggested that SPLC may be in the Children's best interests given that they have expressed a "strong desire" for continued parental contact no matter what the outcome. N.T., 11/6/19, at 208. The legal interests counsel/GAL added that the Children "are fine as of now remaining with the foster parents" but that "they do not want to be adopted." *Id.*

Upon review, we conclude that the trial court did not abuse its discretion when it determined that SPLC was in the Children's best interests. As the trial court based its SPLC orders on the testimony presented and the record supports its factual findings, we conclude no abuse of discretion occurred.

As to Section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between

- 17 -

the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Generally, this Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010).

Our Supreme Court has instructed, however, that this Court should defer to the trial court where a "close call" was made. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

> Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d at 826-27.

In the present case, the trial court denied CYF's petitions to involuntarily terminate the parental rights of Mother and Father pursuant to Section 2511(b), and explained, in part:

Ultimately, to this [c]ourt, the case centered on CYF's failure to prove that termination of parental rights would serve these [C]hildren's needs and welfare by any evidentiary standard. This [c]ourt concluded that termination would in fact be contrary to the [C]hildren's interests. In cases such as these, the court must engage in a "determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super.2011) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)).

Trial Court Opinion, 1/24/20, at 10-11.

As set forth *infra*, the trial court concluded that Mother and Father have demonstrated, however inconsistently, their love and commitment to Children, none of whom want to sever their ties to their parents, and all of whom have beneficial and bonded relationships with them.

Our review of the record supports the trial court's conclusion. Dr. Rosenblum testified that he had considerable reservations about recommending termination. Rather, Dr. Rosenblum opined that "SPLC is probably the choice that presents with the greatest degree of -- the best fit for the [C]hildren right now." N.T., 2/6/19, at 128. With respect to M.-A.D. and Mother, Dr. Rosenblum emphasized that it would be "literally reckless" to terminate Mother's parental rights. *Id.* at 99. Dr. Rosenblum believed "the relationship of [A.Y.D. and A.M.D., Jr.] with both parents, but particularly with [F]ather, is meaningful and, therefore, overall thought a goal of SPLC was perhaps a better selection . . . it would still allow a connection to birth parents, even if it was on a more limited basis." *Id.* at 100-101. Dr. Rosenblum stated that "[e]veryone knows that these children don't want to be adopted and have close connections to their parents."

- 19 -

After a careful review of the record, we conclude that the trial court's findings have sufficient support in the certified record and that the court did not commit an error of law or abuse of discretion in its determination that SPLC is in the Children's best interests pursuant to Section 2511(b).

As discussed *supra*, our Supreme Court has stated, appellate courts – unlike trial courts – are not in a position to make the close calls based on fact-specific determinations. ***In re R.J.T.***, 9 A.3d at 1190. Not only do trial judges observe the parties during the termination hearing, but they usually preside over the dependency hearings with the same parties and have a longitudinal understanding of the case and the best interests of the children involved. ***Id.*** Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment so long as the factual findings are supported by the record and the trial court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of S.P.***, 47 A.3d at 826-827.

In the present case, the trial court explained that "what it came down to is that Dr. Rosenblum believes that neither of [the parents] have demonstrated the capacity to meet [the Children's] essential needs," however, the trial court also determined that "it's not clear and convincing that it's in the [C]hildren's best interests to terminate." N.T., 11/6/19, at 219. The trial court concluded that a goal of SPLC is in the Children's best interests. ***Id.*** at 223.

After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions regarding SPLC are supported by competent evidence in the record, and are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267.

CYF argues that this case is akin to *T.S.M*, *supra*. *See* CYF's Brief at 41-42. In *T.S.M.*, the trial court had denied petitions for the termination of the parental rights of a mother to the five youngest of her seven children. *In re T.S.M.*, 71 A.3d at 253. Each child had been in six to thirteen foster placements, and each was experiencing significant psychological and behavioral problems. *Id.* The trial court found that the evidence supported the termination of parental rights under section 2511(a)(2); however, the trial court also found that termination did not best serve the needs and welfare of the children required under section 2511(b), as well as subsection 2511(a)(5) and (a)(8). *Id.* at 259–60. The trial court pointed to the evidence of a strong bond between the children and mother. *Id.* at 260.

Ultimately, upon review, our Supreme Court noted that, while the parent-child bond was strong, the trial court minimized the children's unhealthy and pathological bond with their mother. *Id.* at 271. The Supreme Court noted that the trial court failed to recognize the substantial, possibly permanent, damage done to the children by the prolonged, unhealthy, pathological bond with their mother that was preventing the children's ability to form attachments to their foster families. *Id.* at 271.

Here, unlike the situation in *In re T.S.M.*, the testimony provided by Dr. Rosenblum supported the trial court's finding that there is a clear bond

between the Children and their parents, and there was no evidence that the bond was harmful. Thus, this Court finds the factual situation in *T.S.M.* distinguishable from the instant appeal, and CYF's argument misplaced.

CYF contends that it was error for the trial court to consider that M.-A.D. was not in a pre-adoptive home when making its decision. *See* CYF's Brief at 54-55. *See* 23 Pa.C.S. § 2512(b) ("If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists."). However, as our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In addition, the Pennsylvania Dependency Benchbook provides that "[w]hile having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of eventual adoption." Administrative Office of Pennsylvania Courts Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook § 12.1 at 126 (2010).

At the time of the final termination hearing in November of 2019, M.-A.D. was thirteen years of age, and had consistently and unequivocally maintained a preference not to have Mother's rights terminated. Although CYF avers that M.-A.D. was residing in a suitable foster home identified as a long-term placement, M.-A.D. had only been in that placement for the two months preceding the November 2019 termination hearing. Moreover, in that two-month period, an incident occurred where M.-A.D. was missing for several

hours and the police were contacted.  N.T., 11/6/19, at 52.  Dr. Rosenblum cautioned:

> [W]e are dealing with a youngster who has significant history of significant mental health and adjustment concerns.  And so, it would be important, in my opinion, to assess it over a reasonable period of time so that one would have certainty.  Two months would certainly seem a bit premature to be making a final conclusion as to whether this is going to be a placement that has a reasonable chance of long-term success.  And even at [M.-A.D.'s] age, you know, it certainly is, in my experience, a much higher risk of an adoptive disruption or a disruption to an adoptive placement, you know, with a youngster who is [eleven] now [thirteen] years of age.  She'll be [fourteen] in three months.

*Id.* at 92-93.

The trial court credited Dr. Rosenblum's testimony that he would be concerned about prematurely moving forward with termination "without more confirmation or evidence over a longer period of time."  *Id.* at 102.

Based on the foregoing, we conclude the trial court's findings are supported by the competent evidence in the record, and the trial court did not err or abuse its discretion in denying CYF's petition to terminate Mother's parental rights as to M.-A.D.  M.-A.D. may never return to the care of Mother, but the trial court found no benefit in making M.-A.D. "a psychological orphan."  N.T., 2/6/19 at 100.  Dr. Rosenblum testified that M.-A.D. derived benefit from her bond with Mother.  *Id.* at 95 and 113.  Simply stated, it is M.-A.D.'s age and the fact that she does not wish to be adopted that make termination of Mother's parental rights not in her best interests.  *See In re Adoption of S.P.*, 47 A.3d at 826-27 ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and

impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.").

Finally, CYF avers that the trial court committed an error of law when it determined that SPLC is the most appropriate permanency option for the Children. Further, CYF argues that it was error for the trial Court to rely on *In re B.S.*, 861 A.2d 974 (Pa. Super. 2004), as that was a goal change case which interpreted the Juvenile Act not the Adoption Act.

As our Supreme Court has previously stated, appellate courts – unlike trial courts – are not in a position to make the close calls based on fact-specific determinations. *In re R.J.T.*, 9 A.3d at 1190. Not only do trial judges observe the parties during the termination hearing, but they usually preside over the dependency hearings with the same parties and have a longitudinal understanding of the case and the best interests of the children involved. *Id.* Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment *so long as the factual findings are supported by the record* and the orphans' court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 827.

Here, the trial court conceded that "in this difficult case, it is noteworthy that even the expert psychologist [, Dr. Rosenblum,] could not offer a view on the preferred outcome with a reasonable [degree of] of professional

certainty." Trial Court Opinion, 1/24/20, at 10. The trial court concluded that, despite the parents' inconsistency in making progress towards their goals, "both have demonstrated love and commitment to the [C]hildren. None of the [C]hildren want to sever their ties, and all express deep affection for their parents and have beneficial and bonded relationships with them" *Id.* at 10. As our Supreme Court has instructed, this Court should defer to the trial court where a "close call" was made. *See R.J.T.*, 9 A.3d at 1190.

After review of the certified record, we find that there was competent, clear and convincing evidence in the record to support the trial court's denial of the petitions to terminate Mother's parental rights to the Children and Father's parental rights to A.Y.D. and A.M.D., Jr. Accordingly, we affirm the trial court's orders.

Orders affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2020